```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| JOHN AND MARY VISCONTI, | HON. JEROME B. SIMANDLE |
| Plaintiffs, | Civil No. 01-5409 (JBS) |
| v. | |
| ANN VENEMAN, SECRETARY, UNITED STATES DEPARTMENT OF AGRICULTURE, | **OPINION** |
| Defendant. | |

APPEARANCES:

James W. Myart, Jr., Esq.
JAMES W. MYART, JR. P.C.
306 Preston Avenue
San Antonio, Texas 78210
     -and-
Nancy L. Hart-Esposito
ARTHUR E. BALLEN, P.C.
1103 Laurel Oak Road
Suite 160
Voorhees, New Jersey 08101
    Attorneys for Plaintiffs

Christopher J. Christie
United States Attorney
    By:  Louis J. Bizzarri, A.U.S.A.
401 Market Street, 4th Floor
P.O. Box 1427
Camden, New Jersey 08101
    Attorney for Defendant

**SIMANDLE**, U.S. District Judge:

   The owners of a vegetable farm in New Jersey have alleged that the United States Department of Agriculture ("USDA") Farm Services Agency ("FSA") discriminated against them on the basis of national origin and sex in violation of the Equal Credit

Opportunity Act, 15 U.S.C. §§ 1691, et seq.[1] The matter is presently before the Court upon the motion for summary judgment by Defendant, Ann Veneman, Secretary, United States Department of Agriculture.  The Court has previously ruled that Plaintiffs may proceed only on their claims pertaining to the events that occurred within 180 days of their August 1, 1997 administrative discrimination complaint.  (See Feb. 3, 2003 Slip Op.) Therefore, the inquiry here is limited to the alleged discrimination by the government regarding its efforts to collect on Plaintiff's delinquent debts between February 1, 1997 and August 1, 1997.  For the reasons explained below, the Court holds as a matter of law that the government did not discriminate against Plaintiffs during the relevant period and, thus, that Defendant's motion should be granted.

I.   **BACKGROUND**

John and Mary Visconti began borrowing from the Farm Service Agency in 1975 and, in October 1977, they purchased a 110-acre inventory farm from USDA inventory property in Cumberland County,

---

[1] Plaintiffs have withdrawn their claim of discrimination on the basis of Plaintiff John Visconti's disability.  (Pls. Opp. Br. at 1 n.1.)

New Jersey.[2] (Hlubik[3] Decl. ¶ 3.)  A purchase money mortgage in the amount of $89,000.00 was filed in the Cumberland County Clerk's Office on October 6, 1977 to secure the USDA credit sale. Plaintiffs operated the farm producing mainly vegetables, grain and fruit.  (Id.)  On or about November 3, 1978, Plaintiffs purchased an additional 84-acre farm with financing in the amount of $95,000.00 from a non-governmental lender.  (Id.)

Between April 1, 1976 and April 4, 1983, Plaintiffs obtained sixteen FSA loans, borrowing a total of $649,000.00.[4]  (Id. ¶ 4.) Because of cash flow difficulties, FSA provided loan servicing in the form of restructuring, and several of these loans were restructured on March 31, 1982.  (Id.)  The restructuring was part of the USDA's effort to service the loans by providing longer terms with lower annual payments in order to improve Plaintiffs' repayment ability.  Despite these efforts, Plaintiffs regularly had difficulty repaying their USDA loans.  (Id. ¶¶ 4-5.)

---

[2] The FSA, formerly known as the Farmers Home Administration (FmHA), is an agency within the USDA which administers federally funded credit and benefit programs to provide and guarantee loans to eligible farmers for farm purchases, debt restructuring, or disaster relief.

[3] Gerald G. Hlubik is the Chief, Farm Loan Programs, New Jersey State Office, FSA, USDA.  (Hlubik Decl. ¶ 1.)

[4] Some of those loans have since been paid in full.  (Hlubik Decl. ¶ 4.)

In the mid-1980's, FSA encouraged the Viscontis to consider a full, or at least partial, liquidation of real estate as a means of reducing overhead and improving cash flow.  (Id. ¶ 6.) Plaintiffs did not heed that advice and, eventually, became seriously delinquent in repaying their FSA loans.  (Id. ¶ 7.)  On February 2, 1986, the FSA sent to Plaintiff a Notice of Intent to Take Adverse Action.  Plaintiffs responded by requesting loan servicing options, including additional restructuring of their debts.  The FSA declined further loan servicing in a letter dated October 18, 1986.  Subsequently, on January 30, 1987, the FSA county office recommended foreclosure to the state office.  (Id.) On March 3, 1987, the USDA loans were accelerated.[5] On March 31, 1987, Plaintiffs filed for Chapter 12 bankruptcy.  The chapter 12 plan was confirmed on or about January 12, 1988, but dismissed on March 8, 1991 due to nonpayment.[6] (Id. ¶ 8.)

Meanwhile, Plaintiffs continued to farm the land and apply for FSA financing.  However, the Viscontis incurred more debts and in 1993 lost title to their farm through foreclosure by the first mortgage holder.  At the resulting sheriff's sale, FSA made

---

[5] Acceleration is defined as declaring a debt due and payable in full.  It is a prerequisite to further collection action, such as foreclosure.  (Hlubik Decl. ¶ 7.)

[6] Additionally, in the late 1980's FSA caused to be initiated an investigation of Plaintiffs by the USDA Office of Inspector General ("OIG") concerning alleged conversion of government property.  That matter was never prosecuted.  (Hlubik Decl. ¶ 9.)

a successful bid on the property and, on May 27, 1993, FSA became the owner of record of the property.  The Viscontis continued to use the property.

On November 26, 1993, FSA notified Plaintiffs by letter of the availability of the "leaseback/buyback" program, a form of preservation servicing under which the former owners of a farm currently in FSA inventory property have an opportunity to regain ownership of the farm.  (Id. ¶ 9.)  In 1996, Plaintiffs applied for leaseback/buyback which was rejected.  That same year Plaintiffs applied for, but were also denied, Homestead Protection, another form of preservation servicing designed to allow borrowers to remain in their homes.  (Id. ¶ 11.)  On September 30, 1996, USDA notified Plaintiffs that it would reevaluate Plaintiffs' earlier unsuccessful application.[7]  FSA county officials subsequently met with Plaintiffs, but again denied their leaseback/buyback request.  (Id.)

On February 4, 1997, the FSA state office sent to the Viscontis a letter of acceleration.  (Def. Att. 1.)  As noted infra n.5, "acceleration" means declaring a debt due and payable in full, and occurs when a debt is delinquent and all servicing rights have been exhausted.  Acceleration is a prerequisite to further collection actions, such as foreclosure.  (Hlubik Decl. ¶

---

[7] The reevaluation was part of FSA's decision to review all leaseback/buyback applications made by April 4, 1996.  (Hlubik Decl. ¶ 11.)

7.) Acceleration is required by regulation on both debt secured by real property and chattel, (id. at 8,) and in the Visconti's case, was authorized by the April 18, 1979 and March 9, 1982 financing statements. (Def. Att. 1.)

On March 3, 1997, the FSA state office notified Plaintiffs by letter of its intent to use administrative offset to collect the outstanding debt. (Def. Att. 6.) The letter, signed by Clyde W. Evans, Agriculture Credit Specialist, informed Plaintiffs that they owed FSA $529,230.75 as of February 27, 1997, but that FSA would not offset that amount if the debt were payed in full within 30 days. (Id.)

Plaintiffs filed timely appeals of both the February 4, 1997 and March 3, 1997 decisions. Subsequently, Plaintiff Mary Visconti contacted the FSA State Executive Director for assistance in resolving the matter. Ultimately, a proposal was made by USDA, the terms of which were set forth in a July 8, 1997 letter. (De. Att. 8.) In short, USDA offered to Plaintiffs a lease with the option to buy, contingent on the payment of roughly $35,000 due at lease signing. Plaintiffs ultimately rejected the proposal.

By letter dated August 1, 1997, Plaintiffs, through an attorney, filed an administrative complaint with the Office of

6

Civil Rights ("OCR") USDA against FSA.[8] That letter requested an investigation into the Viscontis' case because "a cursory review of the Visconti/FSA file indicates that the . . . FSA . . . has violated the Viscontis' rights pursuant to the ECOA."  The letter further stated that:

> there [exists] a course of discriminatory conduct that can be traced, historically and actions related thereto that constitute continuing violations that clearly bring the action within all applicable Statute of Limitations.  Discrimination is claimed in all such prior actions.

(Def. Ex. D.)  The USDA Office of Civil Rights investigated the Viscontis' complaint in May 1998.  In the report of the investigation, the investigator, Helen Nuttall, detailed the extensive evidence that she considered and finally concluded that "the investigation shows that FSA officials had legitimate reasons for those actions that were denied or disapproved." (Def. Ex. E.)  On October 28, 1999, OCR issued its final determination, also finding that there was no "discrimination based on national origin, sex, or disability. . . .  FSA had legitimate non-discriminatory reasons for its actions in this case."  (Def. Ex. F.)

---

[8] Plaintiff had previously complained to the United States Department of Agriculture in letters dated October 31, 1988, June 17, 1991 and April 1, 1997 about treatment they had allegedly received from the Farm Services Agency.  As with the August 1, 1997 letter, the earlier letter complaints were eventually dismissed by the USDA's Office of Civil Rights, either on procedural grounds or because the agency found that they had no merit.

Plaintiffs filed a complaint with this Court on November 21, 2001, asserting that the Secretary of the USDA improperly dismissed their claims. On August 28, 2002, Defendant filed a motion for summary judgment. The sole issue before the Court there was whether Plaintiffs's claims were timely under the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, et seq. By Opinion and Order dated February 3, 2003, the Court denied, in part, summary judgment as to the claims contained in the August 1, 1997 letter.[9] Specifically, the Court found that the claims alleging discrimination between February 1, 1997 and August 1, 1997 – namely, that the FSA discriminated against Plaintiffs by accelerating the administrative offset process on February 4, 1997 and March 3, 1997 – could proceed.[10] Defendant subsequently moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P., seeking dismissal of those remaining claims. That motion is presently before the Court.

---

[9] By that same Opinion and Order, this Court granted Defendant's motion for summary judgment as to all claims in the October 31, 1988, June 17, 1991 and April 1, 1997 letters, as well as those in the August 1, 1997 letter alleging discrimination prior to February 1, 1997. By Opinion and Order dated July 9, 2003, the Court denied the cross-motions for reconsideration.

[10] Specifically, the Court concluded that the complaint had been filed administratively within 180 days of the alleged discriminatory event, and was filed with the court within two years of the discriminatory event exclusive of time spent exhausting administrative remedies. 15 U.S.C. § 1681e(f); 7 C.F.R. § 15d.4.

**II.  SUMMARY JUDGMENT STANDARD OF REVIEW**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Id. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).[11]

The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed. R. Civ. P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted); see Liberty Lobby, 477 U.S. at 249-50. Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment. Liberty Lobby, 477 U.S. at 249-50.

---

[11] Of course, in deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

**III. DISCUSSION**

Under the Equal Credit Opportunity Act ("ECOA" or the "Act"), 15 U.S.C. §§ 1691 et seq., it is "unlawful for any creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of . . . national origin, sex or marital status . . . ." 15 U.S.C. § 1691(a)(1). A plaintiff alleging discrimination under the Act can satisfy this burden either through direct or indirect evidence of discrimination.

When a plaintiff alleging discrimination under ECOA presents "direct evidence" of discrimination, the burden of persuasion as to the issue of causation shifts to the defendant to show that the same action would have been taken even without regard to the plaintiff's national origin or sex. Price Waterhouse v. Hopkins, 490 U.S. 220, 428 (1989). Direct evidence "leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it" when the challenged action was taken. Fakete v. Aetna, 308 F.3d 335, 338-39 (3d Cir. 2002) (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir. 1995)). In other words, the evidence must be "so revealing of discriminatory animus that it is not necessary to rely upon any presumption from the prima facie case . . . ." Carter v. Potter, 2004 U.S. Dist. LEXIS 25677, at *13 (E.D.Pa. Dec. 21, 2004) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994)).

10

Here, the Viscontis concede that there is no direct evidence of discrimination in the record.[12] In the absence of direct evidence, plaintiffs asserting claims under ECOA generally must first show that they (1) were members of a protected class; (2) applied for credit from defendant; (3) were qualified for credit; and (4) despite qualification were denied credit. In re Chiang, 385 F.3d 256, 259 (3d Cir. 2004).  If the plaintiffs are able to make a showing as to each element, the defendant must proffer a legitimate nondiscriminatory reason for the allegedly discriminatory action.  The burden then shifts back to the plaintiffs to demonstrate that the defendant's proffered reasons are pretext for discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 331 (3d Cir. 2000).

However, "[t]he Supreme Court has reminded us that McDonnell Douglas was not intended to be a straightjacket into which every discrimination case must be forced kicking and screaming." Latimore v. Citibank Federal Savings Bank, 151 F.3d 712, 714 (7th Cir. 1998) (citing McDonnell Douglas, 411 U.S. at 802 n.13; U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)).  The Court holds that this is such a case where the

---

[12] Plaintiffs argue only that "they have a prima facie case as to [their ECOA] violations and that the alleged legitimate nondiscriminatory reasons offered by Defendant are pretext for discrimination."  (Pls. Opp. Br. at 12.)

11

traditional McDonnell Douglas framework is not appropriate. Plaintiffs' claims here are based not on their application for (and denial of) credit but, rather, on the government's collection efforts regarding credit that had already been extended to Plaintiffs.[13] Accordingly, the Court will apply a modified version of the familiar burden shifting framework from McDonnell Douglas and examine, in the first instance, whether (1) Plaintiffs were members of a protected class; (2) Plaintiffs applied for and were extended credit from Defendant; and (3) Defendant treated Plaintiffs differently than others outside of the protected class who were otherwise similarly situated.  If Plaintiffs are able to satisfy each element of the prima facie case, the burden will then shift back to the Defendant, as described above.

To be sure, the Third Circuit has "not yet had the occasion to decide whether it is appropriate to shift the burden to a defendant to rebut a prima facie claim of discrimination under ECOA."  In re Chiang, 385 F.3d at 267 n.7.  However, a number of other federal appellate courts have done so for claims under the Equal Credit Opportunity Act, looking to case law in the employment discrimination context for guidance.  See Lewis v. ACB

---

[13] Specifically, Plaintiffs argue that Defendant discriminated against them by denying loan servicing, denying leaseback/buyback, and implementing an administrative offset of the Plaintiffs disaster payments and social security benefits. (Pls. Opp. Br. at 13.)

Bus. Servs., Inc., 135 F.3d 389, 406 (6th Cir. 1998) (adapting the burden allocation framework and burden allocation system found in Title VII cases to claims under ECOA); Moore v. United States Dep't of Agric. ex rel. Farmers Home Admin., 55 F.3d 991, 995 (4th Cir. 1995) (noting McDonnell Douglas applies to ECOA claims in the absence of direct evidence of discrimination); Mercado-Garcia v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992) (applying burden shifting framework from employment discrimination cases to claim under ECOA); Bhandari v. First Nat'l Bank of Commerce, 808 F.2d 1082, 1100-01 (5th Cir. 1987) (applying judicial construction of anti-discrimination legislation in the employment field to ECOA).  But see Latimore, 151 F.3d 714, 715 (7th Cir. 1998) (holding "wholesale transportation of the McDonnell Douglas standard to the credit discrimination context would display insensitivity to the thinking behind the standard," but that application of that framework to ECOA cases is appropriate in certain circumstances). This Court is persuaded that such an approach is correct, especially in light of the legislative history accompanying the 1976 Amendments to the Act explicitly endorsing the three-part burden shifting framework:

> The prohibitions against discrimination on the basis of race, color, religion or national origin are unqualified. . . .  In determining the existence of discrimination on these grounds . . ., courts or agencies are free to look at the effects of a creditor's practices as well as the creditor's motives

>or conduct in individual transactions. Thus judicial constructions of anti-discrimination legislation in the employment field, in cases such as Griggs v. Duke Power Company, 401 U.S. 424 (1971), and Albemarle Paper Company v. Moody, (U.S. Supreme Court, June 25, 1975), are intended to serve as guides in the application of the Act, especially with respect to the allocations of burdens of proof.

S. Rep. No. 94-589, at 4-5 (1976), reprinted in 1976 U.S.C.C.A.N. (90 Stat.) 403, 406. Thus, the Court will now proceed to examine whether Plaintiffs can make out a prima facie case of discrimination based on national origin and sex between February 1, 1997 and August 1, 1997. For the reasons now explained, the Court holds that Plaintiffs are unable as a matter of law to make such a showing.[14]

Plaintiffs here, as noted infra, argue that Defendant discriminated against them by denying loan servicing, denying leaseback/buyback, and implementing an administrative offset of

---

[14] Initially, the Court notes its skepticism of Plaintiffs' claim of discrimination based on Mrs. Visconti's sex. One of the primary purposes of ECOA was to eradicate discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit. See Anderson v. United Finance Co., 666 F.2d 1274, 1277 (9th Cir. 1982). Here, though, the Government extended credit jointly to the Viscontis, not to Mary Visconti individually. Indeed, as Plaintiffs point out in their Brief, Mr. Visconti died on June 30, 2004, well after the events giving rise to this litigation allegedly occurred. (Pls. Opp. Br. at 1 n.1.) Therefore, Plaintiffs' claim of sex discrimination necessarily centers on allegations that Plaintiffs were discriminated against because they were married. Although ECOA prohibits discrimination based on "marital status," Plaintiffs' claim is not the sort contemplated by the Act. In any event, as the discussion below illustrates, Plaintiffs offer no evidence of any discrimination by the Government during the relevant period.

the Plaintiffs disaster payments and social security benefits. (Pls. Opp. Br. at 13.)  In the first instance, the denial of leaseback/buyback and the failure to pay Plaintiffs their disaster payment occurred in 1994, well before the relevant period.  As to the remaining claims, Plaintiffs have pointed to nothing in the record supporting their allegations of discrimination.

Specifically, there is simply no evidence in the record demonstrating that Plaintiffs were treated differently than others on account of their national origin and Mrs. Visconti's sex.  For example, Plaintiffs highlight the statement of Lenny John Rera, a former USDA employee, that Plaintiffs' inquiries were not being properly addressed by USDA.  Specifically, Rera stated during his deposition: "There were eight to ten files that were sitting in a cabinet that weren't addressed.  These were claims that should have been made, put in the system and put in the computer and addressed and they weren't."  (Rera Dep. Tr. at 32:6-33:2.)  Far from supporting a prima facie case of discrimination, that statement only serves to highlight that Plaintiffs were not being treated differently than other loan recipients.  Indeed, Mary Visconti admitted during her deposition that she was not aware of any non-Italians who were treated differently than she and her husband with respect to the loan acceleration.  (M. Visconti Dep. Tr. 57:8-13.)  In short, there

is simply no evidence from which a reasonable factfinder could conclude that Plaintiffs were treated differently than other FSA loan recipients who were delinquent in repaying their loans. Accordingly, Plaintiffs can not satisfy the elements of a prima facie case.

In any event, Defendant offers legitimate nondiscriminatory reasons for the February 4, 1997 acceleration and the March 3, 1997 notice of offset.  As recounted more fully above, Plaintiffs had a history of nonpayment which the government more than once tried to accommodate.  Indeed, as of the date of Ms. Visconti's deposition in this matter, Plaintiffs still had an outstanding debt to the USDA of roughly $545,000.00 (Id. at 17:8-18:8.)  In sum, the events of 1997 merely amounted to actions by FSA to collect on Plaintiffs' delinquent debts and not, as Plaintiffs contend, acts of discrimination.

Finally, Plaintiffs are unsuccessful in demonstrating that the government's reasons for its 1997 collection efforts are pretextual.  The Third Circuit has recognized two ways in which a plaintiff can prove pretext.  First, the plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).  This prong is intentionally a "stringent standard" for plaintiffs because

16

"federal courts are not arbitral boards ruling on the strength of [the defendant's decision].  The question is not whether the [defendant] made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."  <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Alternatively, a plaintiff can provide evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse . . . action."  <u>Id.</u> at 1111.  In other words, a plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradiction in the [defendant's] proffered legitimate reasons for its actions" such that the defendant's "articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the [defendant's] real reason.'"  <u>Jones v. School Dist. Of Philadelphia</u>, 198 F.3d 403, 413 (3d Cir. 1999) (quoting <u>Keller v. Orix Credit Alliance</u>, 130 F.3d 1101, 1108-09 (3d Cir. 1997)).

Plaintiffs here are not able to raise a material factual issue supporting pretext by either of the above methods.  Instead, Plaintiffs rely on nothing more than conclusory allegations by certain former USDA employees.  For example, the Viscontis cite to statements made by Frances Grasso, a former USDA employee, that she believed that Plaintiffs were treated

less favorably than others because of their national origin and because of Mrs. Visconti's sex. First, Ms. Grasso was not even directly involved in the administrative offset or Plaintiffs' application for leaseback/buyback. (Id. at 28:4-23.) Moreover, Ms. Grasso is not able to identify any specific instance of discrimination against the Viscontis during the relevant period. (See Grasso Dep. Tr. at 42-47.) To the contrary, Ms. Grasso's opinion that certain USDA decisions were discriminatory amounted to nothing more than her "gut feeling." (Id. at 77:6-8.) Testimony of other former USDA employees cited by Plaintiffs is equally inadequate. (See Baker Dep. Tr. 25:6-18; Hlubik Dep. Tr. at 36:13-18.)

Such a "gut feeling" unsupported by facts is not admissible opinion evidence under Rule 701, Fed. R. Evid., regarding lay opinion testimony. And, Rule 56(e), Fed. R. Civ. P., which governs the form of supporting and opposing evidence in summary judgment motions, permits consideration only of "such facts as would be admissible in evidence." Thus, the statements by persons unfamiliar with the circumstances of Plaintiff's administrative offset and application for leaseback/buyback may not be considered by the Court. For these reasons, Plaintiffs have fallen woefully short of demonstrating pretext.

In sum, Plaintiffs' have failed to produce either direct or indirect evidence of discrimination by FSA during the relevant period. Accordingly, their claims of discrimination under ECOA must fail.

**IV.  CONCLUSION**

     For all the reasons expressed in this Opinion, the Court will grant Defendant's motion for summary judgment and the Complaint will be dismissed in its entirety.  The accompanying Order will be entered.

**September 20, 2005**         **s/ Jerome B. Simandle**
Date                        JEROME B. SIMANDLE
                             U.S. District Judge